# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

| | |
|---|---|
| STAR CONSTRUCTION, INC. et al. | Case No: 3:03-CV-512-S |
| v. | |
| INTERNATIONAL FIDELITY INSURANCE COMPANY, et al. | **RESPONSE TO MOTION COMPEL DISCOVERY AND TO EXTEND DISCOVERY DEADLINE** |
| **CONSOLIDATED WITH:** | |
| L&W SUPPLY CORPORATION | Case No.: 3:03CV-585-S |
| v. | |
| ACUITY, a Mutual Insurance Company | |

As a result of orders following the telephonic conference with the Court on August 31, 2004, Acuity's motion for an extended discovery schedule is moot, and L&W will not address that portion of Acuity's motion. What remains is Acuity's request to this Court to depose both of L&W's counsel of record in this action, which Acuity has the temerity to present to this Court without satisfying, or even citing, the controlling Kentucky authority of *McMurry v. Eckert*, 833 S.W. 2d 828 (Ky. 1992). Because Acuity's motion does not begin to satisfy the standard for the extraordinary the remedy of deposing opposing counsel, it should be summarily denied.

## I. Relevant Facts

This action results from of the failure of non-party (and now bankrupt) Drywall Acoustics, Inc.'s failure to pay for approximately $130,000 worth of drywall and other

materials supplied to it for the construction of the Journalism and Technology Building at Western Kentucky University, in Bowling Green. As required by Kentucky's procurement statutes, the general contractor, Star Construction, Inc., had obtained a payment bond for the protection of subcontractors and material suppliers from Acuity. It is undisputed that L&W is a beneficiary under that bond. According to the terms of the bond, Acuity's counsel, Laurence J. Zielke, III, asserted a claim on the bond pursuant to a letter dated June 9, 2003 (attached as Exhibit A). In response to Mr. Zielke's letter, Greg Olsen, of Acuity, sent the request for back-up documentation made Exhibit B, which Mr. Olsen testified was a boilerplate response to a bond claim. (Deposition of Greg Olsen, at page 64). Nowhere in its motion does Acuity indicate that there were any conversations between Mr. Olsen and Mr. Zielke containing any relevant information, and Mr. Olsen denied contacting Mr. Zielke about the relevant information he learned. (Olsen deposition, at page 72).

Mr. Zielke followed-up Mr. Olsen's request with a June 25, 2003 letter, enclosing all information supporting the claim (attached as Exhibit C). L&W does not include these exhibits merely to burden the Court's record, but to rebut the unsupported assertion in Acuity's motion that Mr. Zielke provided Acuity with "some" of the documentation regarding L&W's claim. In fact, Acuity paid substantial claims on the same bond based on nothing more than an invoice and a release. Attached as Exhibit D is the entire file recording Acuity's payment of $103,604 to U.S. Specialties, another claimant on Star's bond. Acuity made this payment based on nothing more than an executed release and the three-line aged trial balance printout found at Bates number 2121 in Exhibit D. At no time prior to the commencement of this action did Acuity *ever* request further information from L&W, or

2

suggest in any way that the information provided by Mr. Zielke with his June 25 letter was insufficient to support the claim.

Acuity's bond, attached as Exhibit E, requires it to either pay the bond claim within 30 days of receiving it, or provide a *written* explanation for why it refused to pay any disputed portion of the claim, along with payment of any undisputed portion, all within the same 30 days. Although the claim was submitted on June 9, giving Acuity the benefit of the doubt by starting the clock on June 25 (when back-up documentation was supplied), Acuity's only response during its investigation period set forth in the bond was a deafening silence. In its motion, Acuity does not have a single entry indicating any action taken in July, the month during which Acuity should have adjusted and settled the claim. Acuity had exposed itself to liability under the Unfair Claims Settlement Practices Act before August 2003 had even begun.

On or about August 12, 2003, the *single* conversation between counsel for L&W and Mr. Olsen cited by Acuity took place when the undersigned called Mr. Olsen to find out why Acuity had failed in its obligations under the bond. Not only did Mr. Olsen testify that the substance of this discussion was contained in the undersigned's follow-up letter of August 13 (attached as Exhibit F), he affirmatively represented the same to a consultant in his own August 13 follow-up letter (attached as Exhibit G), in which he stated that the undersigned's letter "serves as a summary to the telephone conversation that I had with Mr. Dwyer on Tuesday, August 12, 2003." Accordingly, there is going to be no dispute of fact regarding anything that was stated during Olsen's conversation with the undersigned, as he agrees that the August 13 letter accurately reflects the substance of the conversation.

Having still heard nothing from Acuity, despite the demand for payment, the undersigned sent the August 18 letter attached as Exhibit H advising Mr. Olsen that Drywall Acoustic's owner, Chris Hawksley, had testified under oath that it had not paid L&W for its materials. This testimony was given at Drywall Acoustics' meeting of creditors at the United States Bankruptcy Court on August 15. The undersigned had advised Mr. Olsen of this meeting in his fax of August 13, and had invited Acuity to a ready-made deposition of Drywall Acoustics, at which time it could have discovered it unquestionably owed L&W its full claim. Acuity chose not to attend the meeting of creditors. As it turned out, Acuity was well aware of Drywall Acoustic's bankruptcy over a month earlier, having been advised by a consultant by email dated July 8 (attached as Exhibit I). Unbeknownst to L&W, Acuity had inquired of Drywall Acoustics regarding whether it had paid L&W by letter of July 1 (attached as Exhibit J). Mr. Hawksley never responded to that letter, for what are now obvious reasons.

After the undersigned's letter of August 18, Acuity decided it needed its own lawyers, and retained Larry Moelmann, who responded with a letter attached as Exhibit K. Mr. Moelmann represents, for the very first time on behalf of anyone at Acuity, that Acuity is considering denying the bond based on its previous payment of funds to Drywall Acoustics. No authority for this position has ever been offered by Mr. Moelmann. The undersigned even took Mr. Moelmann up on his request to perform legal research in Kentucky on the subject, and has found, not surprisingly, that there is no such authority. This letter, nearly two months after the date on which Acuity was obligated to either pay or deny the bond claim is the first suggestion by Acuity that it might not be liable under the bond.

4

Unfortunately, for Acuity, its purported defense has not worked out.

Acuity has never substantively argued that L&W is not a claimant under the bond, and that most if not all, of the bond claim is collectable under the bond. Instead, its response can be paraphrased as "go collect from somebody else." During August, 2003, L&W learned that Drywall Acoustics had provided its own payment and performance bond to Star Construction. Acuity knew this on July 6 (see Exhibit I), but never advised L&W. Through letter of August 25 (Exhibit L), Mr. Moelmann actually told L&W:

> Instead, it is the recommendation of Acuity that Acoustical [L&W] should first assert a claim under the Payment Bond issued by International Fidelity and allow International Fidelity to investigate and respond to the claim. Until that occurs, it is not possible to know if International Fidelity will respond to this claim.

International Fidelity initially proved just as uncooperative as Acuity, as it categorically refused to provide L&W with even a copy of its payment and performance bond.[1] Nonetheless, after reviewing *exactly* the same information provided to Acuity, International Fidelity finally paid L&W's bond claim, and then some, in August, 2004.

As shown above, there were no "negotiations" between Acuity and counsel for L&W. Counsel provided information requested by Acuity, and demanded payment when Acuity failed to comply with its obligations under the bond and under Kentucky law. There is no suggestion of any factual dispute regarding the single telephone conversation relevant to these issues, as Acuity concedes it is accurately set forth in the August 13 letter that followed

---

[1] Acuity refused to produce a copy either, despite repeated requests, and the photocopy attached to International Fidelity's third party complaint is the first time that L&W *ever* saw an executed copy of the bond.

5

it. Despite the representation in its motion that Acuity has set forth the facts it claims can only be uncovered by deposing counsel of record, none of the referenced exhibits state a single relevant fact not already contained in the record, in writing, that could be gleaned from a deposition of counsel.

## II. Argument

No legitimate effort to depose opposing counsel, let alone trial counsel, can be asserted under Kentucky law without meeting the test set forth in *McMurry v. Eckert*, 833 S.W. 2d 828 (Ky. 1992). In *McMurry*, the Supreme Court of Kentucky held:

> In some rare or extraordinary circumstances, the deposition of counsel for a party might be necessary, but the potential for harm to the administration of justice is too great to permit such a practice routinely.

*McMurry*, at 830-831.

In *McMurry*, the defendant sought to take plaintiff's counsel deposition regarding conversation between counsel and the defendant prior to litigation. The trial court and the Court of Appeals entered orders requiring counsel for the plaintiff to appear for deposition regarding conversations with the defendant prior to litigation. The Supreme Court of Kentucky reversed, stating its holding as set forth above. The Court then set forth a test to be applied in analyzing any such requests, requiring that the requesting party establish:

1. No other means exist to obtain the information than to depose opposing counsel;

2. The information sought is relevant and not privileged; and

3. The information is crucial to the preparation of the case.

6

*McMurry,* at 830. In this case, Acuity has not even referenced this requirement, let alone asserted any factual allegation that might satisfy the test.

## A. Any information which could possibly be obtained from counsel can be obtained through Mr. Olsen.

The deposition request in *McMurry* failed on the very first prong of the test, and Acuity's request fails for the very same reason; the other party to the conversation (and correspondence), Greg Olsen, not only is available to testify, but has testified. That testimony makes it clear that there were no negotiations regarding this claim whatsoever. The claim was presented to Mr. Olsen; he asked for supporting data, and was provided it; and he had no further contact with L&W or its representatives until well after he was obligated to respond by the terms of the bond and by Kentucky law. Any information about this process which could be obtained by depositions of counsel has already been obtained from Acuity's own witness.

## B. Much of the information sought by Acuity is not relevant, and is subject to the attorney client privilege.

Beyond the correspondence with Mr. Olsen discussed above, Acuity makes vague references to additional information sought by Acuity's counsel (both directly and through proxy) in 2004, almost a year after this litigation commenced. This issue, manufactured by Acuity's counsel, has no bearing on Acuity's bad faith, as (1) L&W satisfied International Fidelity on the very same issue to the point where that bonding company settled the underlying bond claim and (2) the issue was never raised by Acuity during the period of time in which it committed its tortuous acts.

In the final paragraph of a May 11, 2004 letter, attached as Exhibit M, counsel for

7

International Fidelity, Timothy Martin, requested information regarding an approximately $19,000 payment to L&W by Merit Construction, Inc., the completing contractor on the WKU Journalism building. By letter of May 28, 2004, attached as Exhibit N, counsel for L&W provided counsel for International with invoice printouts confirming that there was no duplication between the amounts billed to the completing contractor and the amount making up the bond claim. International settled the underlying bond claim without obtaining any further information on this subject. Subsequent to this exchange, Acuity has requested additional information on the same payment. As can be seen in Exhibits M and N, International Fidelity was actively engaged in negotiating a settlement to the underlying bond claim when it requested additional information from counsel, and did, in fact, settle the claim. Accordingly, it received the information as requested. Acuity, on the other hand, has *never* made an offer to settle the underlying bond claim, and is in the case solely because of its failure to make timely payment on a claim for which it has never explicitly denied liability. Now that the bond claim has been settled, the individual components that make it up, and which were never questioned when Acuity had the obligation to do so, no longer have any bearing on any remaining issue in this case.

Acuity has also suggested (without making an explanation to the Court) that conversations between trial counsel and *International Fidelity* may be within the scope of the desired discovery. Although it is impossible to tell, due to Acuity's deficient designation of scope, this line of questioning could easily run into attorney client privilege issues or work product, as the undersigned engaged in a substantial investigation to even determine the *existence* of the International Fidelity bond. No case in Kentucky, including those cited by

Acuity, has ever authorized invasion of the attorney client privilege or work product doctrine as a means of discovery.

### C. The information sought by Acuity is not crucial to defending its actions and inactions.

As thoroughly addressed above, the information which Acuity could obtain from deposing counsel outside of the protections of the attorney client privilege and work product doctrine is either redundant, in light of Mr. Olsen's deposition, or irrelevant to the issues related to the bad faith claim.

### D. There is no "right" to depose opposing counsel in a bad faith claim, either under *Riggs v. Schroering* or otherwise.

Although Acuity fails to even mention the dispositive case in Kentucky on the subject; *McMurry*, it asserts that it has a "right" to depose the undersigned under the authority of *Riggs v. Schroering*, 822 S.W. 2d 414 (Ky. 1991). Even read casually, *Riggs* creates no such "right." It upholds a defined, limited scope of inquiry regarding specific facts made clear to the trial court in the petition. Without even addressing the obvious fact that Acuity makes no such representations as to what specific facts it believes it can glean from deposing trial counsel, *Riggs* preceded *McMurry* by one year, and thus cannot form the basis for a deposition of counsel unless the dictates of *McMurry* are met. Acuity cannot meet this test in this action.

### III. Conclusion

Rather than paying legitimate bond claims, Acuity's tactics are obviously to delay until recovery is had from another source. Then, when called to task for its conduct, Acuity's tactics switch to disrupting the relationship between attorney and client and then, inevitably,

attempting to increase plaintiffs' costs by moving to disqualify counsel based on witness status. In light of the failure to even attempt to comply with the controlling authority on this issue, the Court should not allow this ham-handed handed tactic to succeed.

Acuity suggests it should be awarded its attorneys fees because L&W did not offer up its counsel for a deposition. L&W suggests that if there is any issue of sanctions associated with this motion, it should be addressed under Kentucky Supreme Court Rule 3.130(3.3)(a), due to Acuity's raising of the issue of deposing counsel without citing or addressing the controlling standard established by the Supreme Court of Kentucky in *McMurry*.

Based on the foregoing, L&W respectfully requests the Court to deny Acuity's motion.

Respectfully submitted,

John H. Dwyer, Jr.
PEDLEY ZIELKE GORDINIER & PENCE, PLLC
2000 Meidinger Tower
462 South Fourth Avenue
Louisville, KY 40202
(502)589-4600

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was mailed on this 17 day of September, 2004 to:

Joseph L. Hardesty
Matthew A. Gillies
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202-3352

Lawrence R. Moelmann, Esq.
Hinshawn Culbertson
222 North LaSalle St., Suite 300
Chicago, IL 60601-1081

Timothy D. Martin
Alber Crafton, PLLC
Hurstbourne Place, Suite 1300
9300 Shelbyville Road
Louisville, Kentucky 40222

Stephen E. Smith, Esq.
Goldberg & Simpson, PSC
3000 National City Tower
Louisville, KY 40202

John H. Dwyer, Jr.